UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| JOHN VERNON FIELDS,<br><br>　　　　　　　Petitioner,<br>　　v.<br><br>RENEE BAKER, *et al.*,<br><br>　　　　　　　Respondents. | Case No. 3:16-cv-00298-MMD-CLB<br><br>ORDER |

**I.　SUMMARY**

Petitioner John Fields has moved for emergency release from custody pending a decision on the merits of his petition for writ of habeas corpus, citing his risk of infection by the coronavirus disease ("COVID-19"). (ECF No. 52 ("Motion").) Respondents opposed the Motion and Fields replied. (ECF Nos. 55, 57.) For the reasons discussed below, the Court denies the Motion.

**II.　BACKGROUND**

Fields is currently incarcerated at High Desert State Prison ("HDSP") (ECF No. 52 at 22), serving a life sentence without the possibility of parole for first-degree murder. (ECF No. 23-21). Fields' amended petition for a writ of habeas corpus is ripe for review.[1]

**III.　DISCUSSION**

Fields seeks release pending a decision on the merits of his petition, citing the COVID-19 pandemic. (ECF No. 52.) Respondents counter that this Court lacks authority to grant such relief. (ECF No. 55 at 3–5 (citing Fed. R. App. P. 23 (governing the transfer of custody pursuant to an application by a custodian while a federal habeas petition is

---

[1]The reply brief was filed on August 26, 2019. (ECF No. 45.) The Court will resolve the amended petition in the normal course.

pending and the release of a prisoner when a federal habeas decision is under review)).) Specifically, Respondents argue that Fields' Motion relates to his conditions of confinement and would have been more appropriately brought pursuant to 42 U.S.C. § 1983, rather than in his federal habeas action, which is limited to challenging a petitioner's duration or legality of confinement. (*Id.* at 3–4 (citing *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973)).)

Respondents are correct that Federal Rule of Appellate Procedure 23 "does not appear to contemplate release on bail pending an initial decision in district court." *In re Roe ("Roe")*, 257 F.3d 1077, 1080 n.2 (9th Cir. 2001). As such, there are no federal rules or statutes addressing this Court's authority to grant release pending a decision on the merits of a federal habeas petition. Further, the Ninth Circuit has specifically not resolved the issue of "whether a district court has the authority to grant bail pending a decision on a 28 U.S.C. § 2254 habeas corpus petition." *Id.* at 1079–80.

However, the Ninth Circuit has noted that "some modern authorities appear to favor recognizing a federal court's power to grant bail pending a decision on a habeas corpus petition." *Id.* at 1080; *see also Hall v. San Francisco Superior Ct.*, 2010 WL 890044 (N.D. Cal. 2010) (noting "that all of the other circuit courts that have decided the issue [of whether a federal district court can release a state prisoner on bail pending a decision on the merits of his petition] have concluded that the district court indeed possesses such authority"). Further, the Ninth Circuit has stated that "[a]ssuming, *arguendo,* that a district court has the authority to release a state prisoner on bail pending resolution of habeas proceedings in extraordinary cases," the petitioner must "make the requisite demonstration that this is an 'extraordinary case[ ] involving special circumstances or a high probability of success.'" *Roe*, 257 F.3d at 1080 (quoting *Land v. Deeds*, 878 F.2d 318, 318 (9th Cir. 1989) ("Bail pending a decision in a habeas case is reserved for extraordinary cases involving special circumstances or a high probability of success.")); *see also Aronson v. May*, 85 S. Ct. 3, 5 (1964) (explaining that in order to determine whether a habeas petitioner can be released on bail, "it is . . . necessary to inquire

whether, in addition to there being substantial questions presented by the appeal, there is some circumstance making this application exceptional and deserving of special treatment in the interests of justice"). Based on *Roe*, this Court assumes, for purposes of the Motion, that pre-decisional release in a federal habeas action is possible in extraordinary cases.

However, the conditions applicable to pre-decisional release in a federal habeas action are muddled. As one district court recently explained, early case law "held that a conjunctive standard, high probability of success *and* extraordinary circumstances is applicable." *Malanje Phea v. C. Pfeiffer*, No. 2:20-cv-00283-WBS-GGH-P, 2020 WL 1892427, at *2 (E.D. Cal. Apr. 16, 2020) (quoting *Aronson v. May*, 85 S.Ct. 3 (1964) (per Justice Douglas). That court goes on to note, "[h]owever, in *Lands v. Deeds*, [878 F.2d 318, 318 (9th Cir. 1989)] the standard was stated as *either* high probability of success *or* extraordinary circumstances." *Id.* Here, the Court declines to determine whether the conjunctive or disjunctive standard is applicable because Fields fails to meet either condition—a high probability of success or special circumstances.

### A. Likelihood of success on the merits

Fields argues that his remaining ground for relief, which alleges that his appellate counsel performed ineffectively by filing a deficient appendix, has a high probability of success. (ECF No. 52 at 2.) Fields was convicted of murder and conspiracy to commit murder in connection with the death of Jaromir Palensky, and Fields' wife, Linda Fields, who was tried separately, was also convicted of murdering Palensky. (ECF No. 24-8 at 3–4.) At Fields' trial, the state district court—against Fields' objection—admitted prior bad act evidence which showed that Fields and Linda had previously solicited someone to murder an unrelated individual, Roy Mobert, with whom they were engaged in civil litigation. (*Id.* at 4–5.) Specifically, Fields challenged the state district court's admission of: (1) Mobert's lawyer's testimony and documents authenticated by Mobert's lawyer about the Fieldses' debt to Mobert and Mobert's foreclosure proceedings against them; and (2) a tape recording that captured a discussion between Fields, Linda, and Billy

Wells in which Fields and Linda proposed that Wells kill Mobert and make it look like an accident. (*Id.*)

Fields' appellate counsel appealed this decision; however, counsel failed to include Mobert's lawyer's documents and the Wells tape recording[2] in the record on appeal. (*Id.* at 5.) The Nevada Supreme Court noted that it was Fields' responsibility to provide the necessary materials for it to review and that "[w]hile [Mobert's lawyer's] testimony and the pretrial and trial transcripts, which include the closing arguments, permit[ed it] to review the challenge to the Mobert evidence, not having the trial exhibits or a transcript of the Wells tape limit[ed] its scope." (*Id.*) Nonetheless, the Nevada Supreme Court determined that the state district court correctly found that the Mobert evidence was "relevant to motive, intent, knowledge, and identity." (*Id.* at 6.) The Nevada Supreme Court appears to have based this decision on its review of Mobert's lawyer's testimony and the arguments of counsel at a *Petrocelli* hearing, which discussed the Wells tape recording statements. (*Id.* at 6–7.) Moreover, the Nevada Supreme Court determined that "there was sufficient proof, independent of the Mobert evidence, to convict Fields of both murder and conspiracy to commit murder." (*Id.* at 12–13.)

Fields later filed a state habeas petition alleging that his appellate counsel was deficient for failing to include the missing trial exhibits in the record on appeal. (*See* ECF No. 24-32 at 2.) The state district court denied the petition following "an evidentiary hearing, where appellate counsel testified that he did not include some exhibits because he did not believe they were necessary and did not include another exhibit because he believed it would have been more harmful than helpful." (*Id.* at 3.) The Nevada Supreme Court affirmed the state district court's denial of Fields' state habeas petition, concluding that "Fields does not explain how counsel's decisions regarding which exhibits to include in the record on appeal were objectively unreasonable" and that, even assuming his

///

///

[2]The Nevada Supreme Court noted that the tape was played at trial, but it was not transcribed. (ECF No. 24-8 at 5.)

appellate counsel was deficient, "Fields fails to demonstrate that the result of his appeal would have been different." (*Id.* at 3.)

In order to prevail on an ineffective-assistance-of-appellate counsel claim, Fields must show that his appellate counsel acted deficiently and "a reasonable probability that, but for his [appellate] counsel's" deficiency, "he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Notwithstanding Fields' appellate counsel's testimony at the postconviction evidentiary hearing, it appears that Fields' appellate counsel was likely deficient in not including the entirety of the bad act evidence in the record on appeal. However, it appears that the Nevada Supreme Court was also likely reasonable in its determination that Fields failed to demonstrate prejudice from this failure. The Nevada Supreme Court determined that it had sufficient evidence to review the issue, and, importantly, independent of the bad act evidence, the court determined that there was sufficient evidence to support Fields' convictions. (ECF No. 24-8 at 12–13.) Therefore, it is likely that Fields will be unable to demonstrate that he would have prevailed on his appeal absent his appellate counsel's omission of the evidence in the record. *Id.* Accordingly, Fields has not demonstrated that his federal habeas petition has "a high probability of success." *Roe*, 257 F.3d at 1080.[3]

### B. Special circumstances

Fields argues that his age—69—and his serious health issues—chronic heart conditions, chronic lung conditions, and high blood pressure—put him at a high-risk of suffering serious complications if he contracts COVID-19. (ECF No. 52 at 20.) Fields insists that the prison population is especially likely to get infected because prisoners

---

[3]Fields also argues that Linda won relief on the same underlying bad-act-evidence issue, and her trial was materially identical to his trial. (ECF No. 52 at 5.) However, the Nevada Supreme Court rejected Fields' "suggestion that he was prejudiced *per se* because his wife included the exhibits in her appeal and obtained relief on a similar issue," noting that "Fields was charged with conspiracy to commit murder whereas his wife was not." (ECF No. 24-32 at 3.) Indeed, although the Nevada Supreme Court reversed Linda's conviction, concluding that the district court abused its discretion in admitting the Mobert conspiracy evidence, it appears that this decision was based, in part, on the fact that, unlike Fields, Linda "was not charged with conspiracy to commit murder." (ECF No. 31-28 at 12–13.)

cannot practice social distancing, cannot sanitize their living spaces, and cannot wash their hands at will. (*Id.* at 15.) Although the prisons in Nevada have modified their policies somewhat, Fields contends that it is only a matter of time before the spread begins, and, indeed, Fields notes that at least one prison staff member at HDSP has already tested positive. (*Id.* at 17–18.) Additionally, Fields notes that there are gaps in the prisons' new policies meant to combat COVID-19 infections. For example, the screening of staff members does not account for the fact that asymptomatic or pre-symptomatic staff member could unwittingly spread the virus. (ECF No. 57 at 8.) Fields contends that if he contracts the virus, there is no reasonable way the prison system can guarantee him adequate treatment.[4] (ECF No. 52 at 22.)

If he were to be released, Fields explains that he could reside with: (1) his longtime friends Patty and Bill Grenz in Ryndon, Nevada; (2) his sister, Mary Lou Van Nurden, in Kingman, Arizona, which is only "a short two-hour-and-fifteen-minute drive from High Desert"; (3) his brother, James Fields, in Oklahoma; or (4) his daughter, Kelly Jo Fields, in Alabama. (*Id.* at 24; ECF No. 57 at 12–13.) Fields further explains that he would be transported from HDSP to these locations by family or friends. (ECF No. 57 at 7.)

In response, Respondents point out that: there have been no confirmed instances of inmates being diagnosed with COVID-19 at HDPS; the prison personnel who tested positive was placed on immediate administrative leave; the medical staff at HDSP have ensured that Fields will continue to receive medical care during COVID-19 pandemic for his conditions; and Fields' risk of exposure to COVID-19 will increase by traveling to a family member's residence. (ECF No. 55 at 6–7.) Importantly, Respondents also argue that Fields has not shown that prison authorities are unable or unwilling to address COVID-19 problems within the prisons. (*Id.* at 9.) Respondents explain that the Nevada

///

---

[4] Fields acknowledges, however, that there is no treatment for COVID-19 so the fear of inadequate treatment is not unique to those who are in custody like him. (ECF No. 52 at 22.)

Department of Corrections has instituted the following policies in response to COVID-19:

> limiting transfers to and from institutions, screening all individual[s] for COVID-19 signs and symptoms before entry and precluding entry should there be any potential for concern or positive indicators present, reminding inmates of the need to adopt social distancing, ensuring proper cleaning and sanitization of the institutions, and . . . ban[ning] in-person access to all institutions state-wide to all individuals except for employees and essential vendors.

(ECF No. 56-1 at 3.)

To be sure, courts across the United States have recognized the "unprecedented magnitude of the COVID-19 pandemic." *United States v. Boatwright*, No. 2:19-cr-00301-GMN-DJA, 2020 WL 1639855, at *5 (D. Nev. Apr. 2, 2020). "Indeed, over one million people around the globe have already contracted it, and new infections throughout the United States continue to rise at an exponential rate." *United States v. Suzuki*, No. 2:15-cr-00198-GMN-NJK, (D. Nev. Apr. 6, 2020). Accordingly, this Court agrees with Fields that "[a] once-in-a-century worldwide pandemic like this" may qualify, in certain situations, as an extraordinary circumstance. (ECF No. 57 at 6.)

However, after considering the parties' arguments, including Fields' age and health conditions rendering him more vulnerable to COVID-19, this Court finds that Fields' concerns do not *presently* weigh toward release. The first positive COVID-19 test in Nevada occurred on March 2, 2020.[5] While the number of COVID-19 positive tests have increased in the general population of the state, there have been no confirmed COVID-19 cases among inmates housed at HDSP or even in Nevada's state prisons. This Court is aware that an outbreak in Nevada's state prisons is still possible given the challenges in maintaining social distancing in confined quarters. However, as one court noted, if that were to occur, "prison authorities may be able to isolate highly at-risk

---

[5] *See, e.g.*, Briana Erickson, *Patient Zero in Nevada's COVID-19 fight mending after month in coma*, LV Rev. J., Apr. 17, 2020, https://www.reviewjournal.com/local/north-las-vegas/patient-zero-in-nevadas-covid-19-fight-mending-after-month-in-a-coma-2008589/

prisoners, such as [Fields], more easily than isolation or 'social distancing' is achieved in the general population, e.g., housing in administrative segregation, partial lockdowns or transfers." *Malanje Phea*, 2020 WL 1892427, at *2. In fact, NDOC's COVID-19 protocols provide for isolation in the event an inmate exhibits COVID-19 symptoms.[6] Moreover, there is currently no evidence NDOC would not be able to transport COVID-19 positive inmates who need medical support to local hospitals.

In sum, at this time, Fields has not demonstrated "that this is an 'extraordinary case [ ] involving special circumstances." *Roe*, 257 F.3d at 1080. Accordingly, the Court finds Fields has not demonstrated that pre-decisional release is warranted at this time.

## VI. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion.

It is therefore ordered that Petitioner's emergency motion for release pending decision due to risks of infection by COVID-19 (ECF No. 52) is denied.

DATED THIS 20th day of April 2020.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE

---

[6]NDOC's COVID-19 protocols include the following:

If an offender is suspected of having an illness, or if they self-report feeling ill, NDOC medical staff immediately assess the offender and place them in that facility's infirmary or medically observes them in their cell. Medical staff utilize the appropriate test kits, some of which are provided by the State of Nevada, which are then tested by the State Epidemiologist, to determine a diagnosis and treatment.

State of Nevada Department of Corrections, NDOC COVID-19 UPDATES, implemented protocol 10 (last visited Apr. 20, 2020), http://doc.nv.gov/About/Press_Release/covid19_updates/

8